[Civ. No. 18563. Fourth Dist., Div. One. Dec. 19, 1979.]

SAN DIEGO NURSERY COMPANY, INC.,
Plaintiff and Respondent, v.
AGRICULTURAL LABOR RELATIONS BOARD,
Defendant and Appellant.

COUNSEL

Marvin J. Brenner, Ellen Lake and Daniel G. Stone for Defendant and Appellant.

Dressler, Stoll, Hersh & Quesenbery and Marion I. Quesenbery for Plaintiff and Respondent.

OPINION

STANIFORTH, J.—The Agricultural Labor Relations Board (ALRB or Board) appeals from an order of the San Diego Superior Court granting a preliminary injunction prohibiting ALRB agents from conducting "worker education" on the premises of the San Diego Nursery Company, Inc. (Employer) without the Employer's permission. The superior court found "absent express statutory authorization, the ALRB

may not enter an employer's premises for the purposes of worker education without first obtaining the employer's consent."[1]

## FACTS

The Employer operates a nursery in Chula Vista, California. On December 8, 1977, the United Farm Workers of America, AFL-CIO (UFW), filed in the San Diego ALRB office a notice of intention to take access at the Employer's premises, pursuant to title 8, California Administrative Code, section 20900, subdivision (e)(1)(B). The next day, the UFW filed a notice of intention to organize as provided by title 8, California Administrative Code, section 20910. These notices evidence the fact that the UFW would engage in an organizational drive among the Employer's workforce which might culminate in an election petition. Under ALRB regulations (Cal. Admin. Code, tit. 8, § 20910, subd. (c)), the filing of the notice of intent to organize obligated the Employer to provide a list of names and addresses of all employees within five days. The Employer refused to provide such list. Upon the Employer's refusal to comply with the regulations, five ALRB agents entered the Employer's premises before working hours (Dec. 19, 1977) to obtain the information from the workers themselves. The names and addresses of the workers were obtained without incident and no unfair labor charge was filed against the Employer for this refusal to supply the employees list.[2]

The UFW's filing of the notice of intention to take access and intention to organize triggered a second and further ALRB "policy of external education." This policy appears on this record to be of ad hoc

---

[1]The California Agricultural Labor Relations Act of 1975 (the Act) (Lab. Code, § 1140 et seq.) created the ALRB and encompasses the statutory grant of authority to that body to accomplish this stated legislative aim: "In enacting this legislation the people of the State of California seek to ensure peace in the agricultural fields by guaranteeing justice for all agricultural workers and stability in labor relations. [¶] This enactment is intended to bring certainty and a sense of fair play to a presently unstable and potentially volatile condition in the state...." (Stats. 1975, Third Ex. Sess., ch. 1, § 1.)

[2]Such refusal contravenes title 8, California Administrative Code, section 20910, subdivision (c), and was possibly an unfair labor practice in violation of Labor Code section 1153, subdivision (a), insofar as it "interferes with, restrains or coerces agricultural employees in the exercise of their rights guaranteed in Labor Code § 1152." (*Henry Moreno*, 3 A.L.R.B. No. 40; *Excelsior Underwear Inc.*, 156 N.L.R.B. 1236; *N.L.R.B.* v. *Q-T Shoe Manufacturing Co.* (3d Cir. 1969) 409 F.2d 1247, 1253; *Labor Board* v. *Waterman S. S. Co.*, 309 U.S. 206, 226 [84 L.Ed. 704, 715, 60 S.Ct. 493, 503].)

origin. It has not yet been formalized in any ALRB regulation or rule, nor does the Act specifically provide for this policy or program. This program of external education encompasses a brief and specifically limited prepetition access by a specified number of ALRB agents to the Employer's premises for the express purpose of advising, notifying, "educating" both the Employer and the workers of their rights and obligations under the Act. No search or examination into hidden places is contemplated. No search for evidence of violations of statute or regulations is the purpose. No demand for production of documents, papers, is made. What is sought is the brief access by ALRB personnel solely for the purpose of performing a prepetition notice function.

On December 28, 1977, and before any UFW filing of a petition for a representative election as authorized by Labor Code section 1156.3, ALRB agents notified the Employer of its plan to visit its business premises to implement this policy. The Employer verbally denied access to the ALRB agents. On the following day, two ALRB field examiners came to the Employer's premises and attempted to talk, outside the building, to workers. Their arrival was at the end of the work day and immediately before the employees' Christmas party. The ALRB agents were denied access, to talk with the employees. They charged they were physically "blocked," denied entry by the Employer's attorney. The Employer then (Jan. 4, 1978) sought injunctive relief against any entry into its place of business by ALRB agents without (1) their having first obtained a search warrant or (2) an order of the superior court under Labor Code section 1151, subdivision (b). The trial court after hearing denied a preliminary injunction upon the first ground tendered (the requirement of a search warrant). But the court found "absent express statutory authorization" the ALRB and its agents should be enjoined from entering upon the Employer's premises without permission of the Employer for the purpose of conducting worker education. The ALRB appeals this order.

## CONTENTIONS

The Employer contends the ALRB "simply does not have any power to enter private property" to conduct worker education, citing California Constitution, article I, sections 1, 7 and 19. It is argued that the California Legislature has placed express limits on the power of the ALRB to enter an employer's property. Worker education as is projected by the ALRB is not an *investigation* within the statute; even if it

is to be considered an investigation, it could not take place until *after* the filing of a petition for certification or charge of unfair labor practice. Finally, it is urged that the "policy" authorizing the worker education program was adopted in violation of the ALRB's rule-making authority. (Lab. Code, § 1144.)

The ALRB contends the preliminary injunction was improvidently granted for the following reasons: (1) the issue of the right to a qualified but unconsented to access to an agricultural employer's worksite for a purpose necessary to effectuate the stated objectives of the Act has been decided adversely to the employer (*Agricultural Labor Relations Bd.* [*ALRB*] v. *Superior Court*, 16 Cal.3d 392 [128 Cal.Rptr. 183, 546 P.2d 687]); (2) the entry upon the employer's property by the ALRB agent for worker education is expressly authorized by Labor Code section 1151, subdivision (a); (3) worker education is a reasonable and proper means to effectuate the legislative grant of power in Labor Code section 1140.2 and section 1152 "to encourage and protect the right of agricultural employees" to organize and to choose freely their bargaining representatives and to insure that the employees are informed of their statutory right; (4) finally, the worker education program effectuates the ALRB duty under the Labor Code section 1160 to prevent unfair practices and to insure the fairness of the election process and entry upon the employer's property for these limited purposes is constitutionally valid.

DISCUSSION

I

The constitutional question arising from the trespass that occurs when a *labor organizer* goes upon the employer's—grower's—work premises without his consent for the purpose of conducting organizational activities has been determined adversely to the growers by the California Supreme Court in *ALRB* v. *Superior Court, supra*, 16 Cal.3d 392. There the California Supreme Court held the "access rule" promulgated by the ALRB (Cal. Admin. Code, tit. 8, §§ 20900-20901) was valid. Under the terms of the regulation, the right of access was specifically limited in purpose, in time and place, and in the number of organizers permitted to participate; and conduct is forbidden, other than speech, which is "disruptive of the employer's property or agricultural operations, including injury to crops or machinery...." (Cal.

Admin. Code, tit. 8, § 20900, subd. 4(C).) The Supreme Court found the access regulation was constitutional, conformable to federal law and was validly adopted by state administrative agencies pursuant to authority granted by the Legislature. The court held the regulation superseded trespass law.

The growers contended the access regulation was unconstitutional—a deprivation of property rights without due process—a taking of those rights without just compensation. It was argued a balancing test should be employed by which the growers' interest in preventing infringement of their property right would be shown to outweigh the state's interest in permitting union access to the growers' property. The Supreme Court found that a balancing test was inappropriate and instead applied the rule of judicial deference to legislative judgments where only property or economic rights were involved; a reasonable nexus between the regulation and the legitimate government purpose would satisfy substantive due process requirements. The Supreme Court said: "The real parties rely on decisions holding that when a statute or regulation impairs a fundamental personal liberty, the state has the burden of showing that the measure is necessary to promote a *compelling* governmental interest [citations] and that there are no reasonable alternative means of accomplishing that goal [citations]. *That well-known principle, however, is not applicable here*: for the reasons stated at the outset, the access rule is not a deprivation of 'fundamental personal liberties' but a limited economic regulation of the use of real property imposed for the public welfare. [Citation.]" (*ALRB* v. *Superior Court, supra*, 16 Cal.3d at p. 409; italics added.) The Supreme Court reasoned: "Early restraints on the unfettered use of private property—e.g., the doctrines of easement and nuisance—were few in number and narrow in scope. But modern social legislation has added many others—e.g., building codes, zoning restrictions, land use planning, and urban redevelopment—which are far more pervasive in their effect on the rights of property owners. Thus, an eminent authority on the law of property lists no less than 20 ways in which private property is today subject to governmental regulation [citation], and concludes that 'the history of the law of private ownership has witnessed simultaneously a playing-down of absolute rights and a playing-up of social concern as to the use of property. ...Property rights have been redefined in response to a swelling demand that ownership be responsible and responsive to the needs of the social whole. Property rights cannot be used as a shibboleth to cloak conduct which adversely affects the health, the safety, the morals, or

the welfare of others.' [Citation.]" (*Id.*, at p. 404; see also *Robins* v. *Pruneyard Shopping Center*, 23 Cal.3d 899, 906 [153 Cal.Rptr. 899, 592 P.2d 341].)

To buttress these general principles and apply them in a labor dispute context, the California Supreme Court relied upon two "landmark" United States Supreme Court decisions: *Republic Aviation Corp.* v. *Board*, 324 U.S. 793 [89 L.Ed. 1372, 65 S.Ct. 982] and *Labor Board* v. *Babcock & Wilcox Co.*, 351 U.S. 105 [100 L.Ed. 975, 76 S.Ct. 679] as constitutional authority for the principle that an employer's right to control his property ""does not permit him to deny access to his property to persons whose presence is necessary there to enable the employees effectively to exercise their right to self-organization and collective bargaining,. . .""" (*ALRB* v. *Superior Court, supra*, 16 Cal.3d at p. 405.)

After reviewing the federal authorities, the California Supreme Court concluded: "Thus the rule of *Babcock & Wilcox*, both as enunciated and as applied, is clear: if the circumstances of employment 'place the employees beyond the reach of reasonable union efforts to communicate with them, *the employer must allow the union to approach his employees on his property.*' (Italics added.) [Citation.] This language could not be plainer. We deem it dispositive of the issue of the federal constitutionality of access to agricultural property under the challenged regulation of the ALRB [citation], and of the claim of invalidity premised on the cited provisions of the California Constitution. [Citation.] In the present context we construe those sections to guarantee no greater rights to California property owners than do their federal counterparts." (*ALRB* v. *Superior Court, supra*, at p. 409.)

■ Based upon the reasoning and authority of *ALRB* v. *Superior Court (supra)*, it follows a fortiori, a duly promulgated administrative regulation authorizing an unconsented but specifically limited entry upon a grower's work premises by an agent of the ALRB in performance of duties imposed by the Act would transgress no constitutional command.

## II

Our conclusion that administrative regulations are not constitutionally invalid merely because they place a burden—authorize a trespass—

on an agricultural work site, does not compel a finding the injunctive relief granted here was improper. We must examine further into the Act.

Both the Employer and the ALRB cite and rely upon Labor Code section 1151, subdivision (a), as the statutory source (or barrier) to the "access policy" here sought to be applied. Concerning the "investigation powers" of the ALRB, the Legislature declared: "For the purpose of all hearings and *investigations*, which, in the opinion of the board, are necessary and proper for the exercise of the powers vested in it by Chapters 5 (commencing with Section 1156) and 6 (commencing with Section 1160) of this part: [¶] (a) *The board, or its duly authorized agents or agencies, shall at all reasonable times have access to, for the purpose of examination, and the right to copy, any evidence of any person being investigated or proceeded against that relates to any matter under investigation or in question. The members of the board or their designees or their duly authorized agents shall have the right of free access to all places of labor.*" (Italics added.)

Labor Code section 1151, subdivision (a), in authorizing access to ALRB agents to "evidence" and "all places of labor" is a constitutional exercise of legislative authority, provided its application is conformable to the limiting principles set forth in *ALRB* v. *Superior Court, supra*, 16 Cal.3d 392.

The access here sought, however, is not pursuant to an administrative regulation promulgated under Labor Code section 1144[3] (as in *ALRB* v. *Superior Court, supra*) but rather is an ad hoc administrative "policy." To pass constitutional muster, the challenged procedure—whether an ad hoc rule or a formal regulation made conformable to the Labor Code section 1144—must comport with the statutory and judicially identified prerequisites to validity.

■ In assessing validity of a rule, our task is to inquire into the legality of the challenged regulations, not its wisdom. (*Morris* v. *Williams*, 67 Cal.2d 733, 737 [63 Cal.Rptr. 689, 433 P.2d 697].) Second, in reviewing the legality of a regulation/policy adopted pursuant to a delegation of legislative power, the judicial function is limited to de-

---

[3]"In addition to its adjudicatory and executive powers, the board is vested with express legislative authority: section 1144 delegates to the board the power to make, amend, and repeal 'such rules and regulations as may be necessary to carry out the provisions' of the ALRA." (*ALRB* v. *Superior Court, supra*, 16 Cal.3d at p. 400.)

termining whether it (1) is "within the scope of authority conferred" (Gov. Code, § 11373) and (2) is "reasonably necessary to effectuate the purpose of the statute." (Gov. Code, § 11374.)

Conformable to these ground rules we analyze the challenged "policy." The Employer contends the grant to ALRB agents to "access to all places of labor" in Labor Code section 1151, subdivision (a), must be limited to "hearings and investigations" *already* underway; therefore the access for the purposes here delineated—if conceded to be in the nature of an "investigation"—could not take place until after a petition for certification (election) or a charge of unfair labor practice had been filed. The Employer points to Labor Code section 1156.3, subdivision (a)(4), providing in part: "Upon receipt of such signed petition, the board shall immediately investigate such petition. . . ." The Employer further would limit the Board's investigation powers to a law dictionary definition of the term investigation.

■ The investigative authority of the Board must be measured by reference to the legislative grant of authority and imposition of duties. The ALRB akin to its model, the National Labor Relations Board (NLRB), has the duty to protect the integrity of the labor election process. It has the duty to supervise the election process. (*People* v. *Medrano*, 78 Cal.App.3d 198, 205 [144 Cal.Rptr. 217]; *ALRB* v. *Superior Court, supra*, 16 Cal.3d at pp. 398-400.)

In *Labor Board* v. *Waterman S. S. Co., supra*, 309 U.S. 206, 226 [84 L.Ed. 704, 715], a federal Court of Appeals[4] had refused to enforce an NLRB decision that the employer, a steamship company, was required to grant passes to CIO organizers because the company had permitted rival AFL organizers to contact the workers aboard ship. A union representation election had been directed but delayed pending the outcome of the unfair labor practice proceeding. Although the National Labor Relations Act did not specifically authorize the remedy ordered by the NLRB, the Supreme Court held "[t]he control of the election proceeding, and the determination of the steps necessary to conduct that election fairly were matters which Congress entrusted to the Board alone. [Fn. omitted.] Interference in those matters constituted error on the part of the court below." (*Ibid.*)

---

[4]Labor Code section 1148 expressly directs the ALRB to follow "applicable precedents" of the National Labor Relations Act. We therefore cite federal authority, where applicable, as controlling precedent.

This *Waterman* principle has been frequently relied upon by NLRB and the courts to authorize the Board's action to protect the integrity of the election process even where the NLRA had not expressly authorized the remedy or procedure utilized. For example, in *Excelsior Underwear Inc., supra,* 156 N.L.R.B. 1236, the labor board held an employer would be required to furnish the board with a list of the employees' names and addresses for transmittal to the union after an election had been directed. Said the board: "The considerations that impel us to adopt the foregoing rule are these: 'The control of the election proceeding, and the determination of the steps necessary to conduct·that election fairly [are] matters which Congress entrusted to the Board alone.' In discharging that trust, we regard it as the Board's function to conduct elections in which employees have the opportunity to cast their ballots for or against representation under circumstances that are free not only from interference, restraint, or coercion violative of the Act but also from other elements that prevent or impede a free and reasoned choice. Among the factors that undoubtedly tend to impede such a choice is a lack of information with respect to one of the choices available. In other words, an employee who has had an effective opportunity to hear the arguments concerning representation is in a better position to make a more fully informed and reasonable choice. Accordingly, we think that it is appropriate for us to remove the impediment to communication to which our new rule is directed." (*Id.,* at p. 1240; fns. omitted.)

The validity of the "Excelsior list" disclosure requirement was upheld by the United States Supreme Court in *NLRB* v. *Wyman-Gordon Co.,* 394 U.S. 759 [22 L.Ed.2d 709, 89 S.Ct. 1426]. The Supreme Court declared that a direction to an employer to submit a list of the names and addresses of its employees, when incorporated in a board order to hold a representation election "is unquestionably valid" (*id.,* at p. 766 [22 L.Ed.2d at p. 715]) since it was entered "in an adjudicatory proceeding" (*id.,* at p. 766 [22 L.Ed.2d at p. 715]); that the board has "a wide discretion to insure the fair and free choice of bargaining representatives" (*id.,* at p. 767 [22 L.Ed.2d at p. 716]); "[t]*he disclosure requirement furthers this objective by encouraging an informed employee electorate and by allowing unions the right of access to employees that management already possesses*" (*ibid.;* italics added); and "[i]t is for the Board and not for this Court to weigh against this interest the asserted interest of employees in avoiding the problems that union solicitation may present." (*Ibid.*)

For definition of the term "investigation," we rely upon applicable federal precedent. In conducting a representation election, the NLRB has access to all "investigatory" powers as provided in section 11, subdivision (1) of the NLRA. (29 U.S.C. § 161(1); *NLRB* v. *Wyman-Gordon Co., supra,* 394 U.S. 759; *N.L.R.B.* v. *Hanes Hosiery Division* (4th Cir. 1967) 384 F.2d 188, 191-192, cert. den. 390 U.S. 950 [19 L.Ed.2d 1141, 88 S.Ct. 1041].) A major difference between the NLRA section 11, subdivision (1), and ALRA section 1151, subdivision (a), is that the state provision grants to the ALRB the "right of free access to all places of labor." The insertion of this sentence in the California Act indicates the intention of the California Legislature to give the ALRB broader investigatory powers than the NLRB.

Furthermore, like its NLRA model, section 1151, subdivision (a) of the Act grants investigative powers to the ALRB which, *"in the opinion of the board, are necessary and proper"* (italics added) to carry out the statutory duties imposed in connection with the election processes and unfair labor practices procedures.

This language suggests that the Congress/Legislature did not envisage "a narrowly confined use" of the investigatory processes. (*N.L.R.B.* v. *Rohlen* (7th Cir. 1967) 385 F.2d 52, 56.)

When defining the term "investigation," the federal courts again eschewed any narrow construction of the NLRA. In *N.L.R.B.* v. *Q-T Shoe Manufacturing Co., supra,* 409 F.2d 1247, the court said (p. 1253): "We are in agreement with the District Court to the extent that it held a representation proceeding to be an investigation within the purview of the Act." (29 U.S.C. § 161.)

This definition of the entire representation (election) process as an "investigation" within the meaning of the federal act has been accepted without dissent by the federal courts. (See *British Auto Parts, Inc.* v. *N.L.R.B.* (9th Cir. 1968) 405 F.2d 1182, cert. den. 394 U.S. 1012 [23 L.Ed.2d 39, 89 S.Ct. 1625]; *NLRB* v. *Hanes Hosiery Division, supra* (4th Cir. 1967) 384 F.2d 188, 192, cert. den. 390 U.S. 950 [19 L.Ed.2d 1141, 88 S.Ct. 1041]; *N.L.R.B.* v. *Rohlen, supra,* 385 F.2d 52, 54-57; *Kearney & Trecker Corp.* v. *National Labor Rel. Bd.* (7th Cir. 1953) 209 F.2d 782, 786; *Inland Empire Dist. Council, etc.* v. *Millis,* 325 U.S. 697, 707 [89 L.Ed. 1877, 1883-1884, 65 S.Ct. 1316].)

In pursuance of these broad powers of control over the election process, and the determination of the steps necessary to conduct the election fairly, the Board has by its rule-making process established a series of procedures—all taking place before the filing of any petition. These prefiling activities include the notice by the union of intention to take access to the employer's premises (Cal. Admin. Code, tit. 8, § 20900, subd. (e)(1)(B)); the notice of intention to organize (Cal. Admin. Code, tit. 8, § 20910); and the requirement of the employee (Excelsior) list (Cal. Admin. Code, tit. 8, § 20910, subd. (c)). These regulations were adopted by a state administrative agency pursuant to a delegation of rule-making authority by the Legislature and have "the force and effect of a statute." (*ALRB* v. *Superior Court, supra*, 16 Cal.3d at p. 401.) These rules were precipitated directly by the legislatively imposed time parameters for labor representation election in the California agribusiness physical setting. These rules are but a recognition of a simple fact: If the Board is to carry out its statutorily imposed duties, its control over the election process does not begin at the moment of filing of the petition for election.

A similar contention of lack of authority in the Board to conduct an "investigation" prepetition filing was made in *Henry Moreno, supra*, 3 A.L.R.B. 40, where it was stated: "Respondent argues that because § 20910 applies to the period *before* a petition for certification is filed pursuant to Labor Code § 1156.3(a), the Board cannot have enacted this rule pursuant to the authority to conduct elections vested in it under Chapter 5 of the Act. We disagree. The purpose of the requirements set forth in Chapter 5 concerning the conduct of elections is to require the Board to conduct elections under certain circumstances. . . .

"Nothing in this statutory scheme prohibits the Board from enacting regulations providing for such investigations as it deems necessary and proper to carry out the provisions of these chapters. . . ."

■ Thus, the Board's own rules and decisions have interpreted the statutory language to mean the election "investigation" commences before the filing of the petition for election. The ALRB is the agency entrusted with the enforcement of this Act and its interpretation of the Act is to be accorded "great respect by the courts and will be followed if not clearly erroneous." (*Bodinson Mfg. Co. v. California E. Com.*, 17 Cal.2d 321, 325 [109 P.2d 935].)

Based upon the foregoing authorities, federal and state, we conclude the challenged ad hoc policy violates no statutory command. An appropriately tailored rule authorizing prepetition access for a limited purpose would not be prohibited by the Act. In short, the administrative agency would not exceed the authority conferred on it by statute in engaging in such rulemaking.

### III

This conclusion is but prologue to the Employer's final contention, to wit, the ALRB did not comply with Labor Code section 1144[5] but rather arrived at its decision to take the limited access for the stated purpose by an administrative ad hoc fiat.

We again note, the ALRA is required to follow the NLRA precedents *if applicable.* (Lab. Code, § 1148.) And further, in *NLRB* v. *Wyman-Gordon Company, supra,* 394 U.S. 759, the United States Supreme Court held the NLRB was not required to follow the formal rulemaking procedures as set forth in 29 United States Code section 156. Further, the Board contends the plain language of Labor Code section 1151, subdivision (a), does not require it to promulgate any regulations under section 1144 before its agents could exercise their "right of free access to all places of labor." And finally, we are mindful of the California Supreme Court's statement in *ALRB* v. *Superior Court, supra,* 16 Cal.3d 392, 413, of the well-settled principle of administrative law, that in discharging its delegated responsibility, the choice between proceeding by general rule or by ad hoc adjudication "'lies primarily in the informed discretion of the administrative agency'" citing *Securities and Exchange Commission* v. *Chenery Corp.,* 332 U.S. 194 [91 L.Ed. 1995, 67 S.Ct. 1575].

---

[5]Labor Code section 1144 provides: "The board may from time to time make, amend, and rescind, in the manner prescribed in Chapter 4.5 (commencing with Section 11371) of Part 1 of Division 3 of Title 2 of the Government Code, such rules and regulations as may be necessary to carry out the provisions of this part."

The term "such rules and regulations" is defined by Government Code section 11371, subdivision (b), as follows: "'Regulation' means every rule, regulation, order, or standard of general application or the amendment, supplement or revision of any such rule, regulation, order or standard adopted by any state agency to implement, interpret, or make specific the law enforced or administered by it, or to govern its procedure, except one which relates only to the internal management of the state agencies. 'Regulation' does not mean or include any form prescribed by a state agency or any instructions relating to the use of the form, but this provision is not a limitation upon any requirement that a regulation be adopted pursuant to this part when one is needed to implement the law under which the form is issued."

We are not here dealing with a rule of internal administration or a procedural requirement affecting the internal workings of the ALRB, but rather with a rule of access which involves an unconsented invasion, a technical trespass on private property. Such a right is protected by both the state and federal Constitutions. While rights in property are not absolute, nevertheless, any impingement thereon should only be made subject to reasonable limitations.

Furthermore, the ad hoc disposition or impairment of rights of this magnitude and nature does not further the express purposes of the Act. The ad hoc approach to such an issue may—did—lead to confrontation, to disruption of the labor peace. Thus, one of the prime objectives of the Act is thwarted by an invasion of a property right without the opportunity of hearing and care and preciseness in adjudication of the various factors which are necessary to authorize a limited entry. The California Supreme Court in *ALRB* v. *Superior Court, supra*, 16 Cal.3d 392, has detailed a variety of factors which must be considered in arriving at a rule of access and emphasizes the careful delimitation of any such rule adopted. The Supreme Court stated: "'The legislatively declared purpose of bringing certainty and a sense of fair play to a presently unstable and potentially volatile condition in the agricultural fields of California can best be served by the adoption of the rules on access which provide clarity and predictability to all parties. Relegation of the issues to a case-by-case adjudication or the adoption of an overly general rule would cause further uncertainty and instability and create delay in the final determination of elections.'" (*Id.*, at p. 416.)

No better reasoning in support of these conclusions can be found outside the dissent of Justice William O. Douglas in *NLRB* v. *Wyman-Gordon Company, supra*, 394 U.S. 759, where he stated: "The rule-making procedure performs important functions. It gives notice to an entire segment of society of those controls or regimentation that is forthcoming. It gives an opportunity for persons affected to be heard. Recently the proposed Rules of the Federal Highway Administration governing the location and design of freeways, 33 Fed.Reg. 15663, were put down for a hearing; and the Governor of every State appeared or sent an emissary. The result was a revision of the Rules before they were promulgated. 34 Fed.Reg. 727.

"That is not an uncommon experience. Agencies discover that they are not always repositories of ultimate wisdom; they learn from the sug-

gestions of outsiders and often benefit from that advice. See H. Friendly, The Federal Administrative Agencies 45 (1962).

"This is a healthy process that helps make a society viable. The multiplication of agencies and their growing power make them more and more remote from the people affected by what they do and make more likely the arbitrary exercise of their powers. Public airing of problems through rule making makes the bureaucracy more responsive to public needs and is an important brake on the growth of absolutism in the regime that now governs all of us.

"  .   .   .   .   .  .  .   .   .   .   .   .   .   .   .   .

"Rule making is no cure-all; but it does force important issues into full public display and in that sense makes for more responsible administrative action." (*Id.*, at pp. 777-779 [22 L.Ed.2d at pp. 721-722].)

The foregoing considerations compel our disapproval of the Board's efforts to proceed on an ad hoc "policy" basis to take unconsented access to the grower's worksite.

Judgment affirmed.

Brown (Gerald), P. J., concurred.

Cologne, J., concurred in the result.