Roy O. HOFFMAN, Regional Director of the Twentieth Region of the National Labor Relations Board, for and on Behalf of the NATIONAL LABOR RELATIONS BOARD, Petitioner-Appellee,

v.

CEMENT MASONS UNION LOCAL 337, OPERATIVE PLASTERERS' AND CEMENT MASONS' INTERNATIONAL ASSOCIATION OF the UNITED STATES AND CANADA, AFL–CIO, et al., Respondents-Appellants.

NATIONAL LABOR RELATIONS BOARD, Petitioner,

v.

CEMENT MASONS UNION LOCAL 337, OPERATIVE PLASTERERS' AND CEMENT MASONS' INTERNATIONAL ASSOCIATION OF the UNITED STATES AND CANADA, AFL–CIO, Respondent.

Nos. 71–1439, 71–2828.

United States Court of Appeals, Ninth Circuit.

Oct. 26, 1972.

Stewart Weinberg (argued), Victor J. Van Bourg, Mark Wurm, Michael B. Rodgers, of Levy & Van Bourg, San Francisco, Cal., for respondents-appellants.

Patrick Hardin (argued), Elliott Moore, Janet C. McCaa, Lawrence D. Levien, Attys., Julius G. Serot, Marcel Mallet-Prevost, Asst. Gen. Counsels, Dominick L. Manoli, Associate Gen. Counsel, Arnold Ordman, Peter G. Nash, Gen. Counsels, NLRB, Washington, D.C., Roy O. Hoffman, Director, Harvey Letter, William W. Wertz, Attys., NLRB, Region 20, San Francisco, Cal., for petitioner-appellee.

Before CARTER and WALLACE, Circuit Judges, and BYRNE, District Judge.*

JAMES M. CARTER, Circuit Judge:

These cases were consolidated for argument and decision because they involve common questions. In No. 71–2828, the National Labor Relations Board seeks enforcement of its decision that picketing by the Cement Masons Union violated Section 8(b)(4)(ii)(B) of the National Labor Relations Act, 61 Stat. 136, 73 Stat. 519, 29 U.S.C. § 158(b)(4)(ii)(B) (1970). In No. 71–1439, the Union appeals from a judgment of civil contempt for picketing in violation of a temporary injunction issued by the District Court on application of the Regional Director of the N.L.R.B., pursuant to Section 10 (*l*) of the Act, 29 U.S.C. § 160(*l*) (1970).

The common question presented is whether through picketing, or patrolling with signs and handbills, a union may appeal to consumers not to purchase the sole product of a secondary employer, himself not involved in a dispute with the union. We grant the petition to enforce and affirm the judgment of contempt.

### Facts

These actions arose from the Union's displeasure over wages and working conditions afforded nonunion employees by one Whitney, a general contractor with whom the Union had no direct dealings. Whitney, the "primary employer," built homes at Oak Hills subdivision which were owned and sold by one Shuler, the "secondary employer." Whitney and Shuler are clearly separate entities. Shuler has homes and apartments for sale at other locations, some built by Whitney, but we are here concerned only with the homes at Oak Hills, which are Shuler's sole product at that site.

In No. 71–2828, the same events gave rise to an unfair labor practice charge before the Board. A trial examiner

---

* Hon. William M. Byrne, Senior District Judge, Central District of California, sitting by designation.

found the Union's conduct to be unlawful. The Board affirmed his decision on May 4, 1971, 190 N.L.R.B. No. 46, concerning the picketing which began on August 15, 1970. The same result was reached as to the earlier picketing in a supplemental decision of July 30, 1971, 190 N.L.R.B. No. 52. The Union was ordered to terminate its picketing, and take certain affirmative action.

From about May 2 to late July, 1970, the Cement Masons Union picketed the only entrance to Oak Hills subdivision with signs reading: "TO CONSUMERS ONLY. Cement Masons Work done by General Contractor below Standard Established by Cement Masons Local 337, Monterey County. PLEASE DO NOT PURCHASE THESE HOMES."

After notice and hearing, the District Court in No. 71–1439, on July 29, 1970, enjoined such picketing pending the N.L.R.B.'s final determination whether such conduct violated the Labor Management Relations Act.

From about August 15, to at least October 3, 1970, the Union stationed a man at the same location with a sign which read: "I AM A CEMENT MASON UNION HANDBILLER—PLEASE TAKE MY *HANDBILL.*" At times the word "UNION" did not appear on the sign. The Union concurrently distributed a handbill reading: "TO CONSUMERS ONLY: Please do not purchase these homes. The General Contractor constructed these homes using persons to perform Cement Masons' work below standards established by Cement Masons' Union in this area." This activity occurred only on weekends at times when Whitney's employees were not on the job. However, the Board found that it reached about 80 percent of Shuler's potential buyers.

On November 5, 1970, after notice and hearing, the District Court in No. 71–1439 held the Union in civil contempt for its actions in violation of the temporary injunction, assessing pecuniary penalties and requiring the usual notices and conforming conduct.

*Enforcement of the N.L.R.B. Order*

Section 8(b)(4)(ii)(B) of the Act, *supra,* 29 U.S.C. § 158(b)(4)(ii)(B), in pertinent part, makes it an unfair labor practice for a union to "threaten, coerce, or restrain any person" with an object of "forcing or requiring any person to cease using . . . or otherwise dealing in the products of any other producer . . . or manufacturer, or to cease doing business with any other person . . . *Provided,* [that primary picketing is not made unlawful under this section and that] nothing [in this paragraph] shall be construed to prohibit publicity, other than picketing, for the purpose of truthfully advising the public, including consumers and members of a labor organization, that a product . . . [is] produced by an employer with whom the labor organization has a primary dispute and [is] distributed by another employer, as long as such publicity does not have an effect of inducing any individual employed by any person other than the primary employer [to refuse delivery or stop work]."

 Thus, peaceful picketing directed solely to consumers, which asks them not to purchase specified struck products from a neutral secondary employer, is not prohibited by the Act. N. L. R. B. v. Fruit & Vegetable Packers and Warehousemen, Local 760, 377 U.S. 58, 84 S.Ct. 1063, 12 L.Ed.2d 129 (1964) [hereinafter cited as *Tree Fruit*]. A union may "follow the struck product" into the secondary establishment, however, only if such secondary boycott does not attempt to influence customers to completely cease *all* transactions with the neutral employer. *Tree Fruit, supra,* at 72, 84 S.Ct. 1063; Honolulu Typographical Union No. 37 v. N. L. R. B. (1968), 131 U.S. App.D.C. 1, 401 F.2d 952, 957 [hereinafter cited as *Honolulu*]. *See* American Bread Co. v. N. L. R. B. (6 Cir. 1969) 411 F.2d 147, 154. The basis of the statute is congressional concern that neutral third-party employers not be involved in labor disputes not their own. *E. g.,* N. L. R. B. v. Local 825, International Union of Op-

erating Engineers, 400 U.S. 297, 302, 91 S.Ct. 402, 27 L.Ed.2d 398 (1971).

The present cases are factually unlike *Tree Fruit, supra.* The Supreme Court there approved picketing of retail food stores that was narrowly confined to requesting consumers not to purchase the struck product, which was one of many products sold in the stores. Instead, we have here a single product for sale by the secondary, the homes, a part of which, the masons' work, was produced under the disputed labor conditions.

■ Congress determined that when a union's interest in picketing a primary employer at a "one product" site, was in direct conflict with the need to protect such neutral employers from the labor disputes of others, the neutral's interests would prevail. *See,* Operating Engineers, *supra,* 400 U.S. at 302–303, 91 S.Ct. 402; *Tree Fruit, supra,* 377 U.S. at 70–71, 84 S.Ct. 1063; International Brotherhood of Teamsters, Chauffeurs, Warehousemen & Helpers Union, Local 309 v. Hanke, 339 U.S. 470, 475–478 & n. 5, 70 S.Ct. 773, 94 L.Ed. 995 (1950). In the latter case it was pointed out that a union may thus be foreclosed from unbridled "free speech," but this interest must be balanced against the infringement it causes to the rights of others. 339 U.S. at 474–475, 70 S.Ct. 773. "Peaceful consumer picketing to shut off all trade with the secondary employer unless he aids the union in its dispute with the primary employer, is poles apart from such picketing which only persuades his customers not to buy the struck product." *Tree Fruit, supra,* 377 U.S. at 70, 84 S.Ct. at 1070. Asking the public to totally boycott a neutral, is tantamount to a demand that he cease dealing with the primary object of the Union's grievance. *Id.* at 72, 84 S.Ct. 1063. It is just such activity which the Act prohibits.[1]

The Union's conduct here, in requesting that consumers not purchase Shuler's homes, could, if effective, result only in coercing Shuler to cease doing business with Whitney. Their contract was terminable on 24-hour notice. The Board found that such conduct was within the proscription of the statute.

■ From about August 15, 1970, the Union adopted a sign and handbill method of appeal rather than traditional sign-only picketing. But the mere use of a handbill does not convert its action into unsanctioned "publicity, other than picketing, for the purpose of truthfully advising the public" that the product is a subject of dispute. 29 U.S.C. § 158(b) (4)(ii)(B), *supra; Tree Fruit, supra,* 377 U.S. at 70–71, 84 S.Ct. 1063. The sign simply referred to the handbill, which stated the Union's message. We have no difficulty agreeing with the Board that this was picketing. But even if it were not, the Board also found, on conflicting evidence, that the Union's false claims were made "with knowledge of, or reckless disregard for, the truth," because Whitney's wages were not in fact below union standards, a fact which the Union did not attempt to discover. The publicity exception of the statute does not apply.

■ The Union urges that its signs and handbills sufficiently identified Whitney as the general contractor with whom it had a dispute, so that the public

---

1. The Union's suggestion that its conduct is protected by Amalgamated Food Employees, etc. v. Logan Valley Plaza, Inc., 391 U.S. 308, 88 S.Ct. 1601, 20 L.Ed.2d 603 (1968), is without merit. Our concern here is not with access to private property for First Amendment purposes, but with regulation of labor-management relations. This is not to say that unions are always foreclosed from informational activity. But balancing of the union's interest against the restricting state interest does not occur until the Union shows a protected interest. When their picketing, under the guise of informing the public, has the proscribed coercive effects upon a neutral employer, less coercive means of expression must be used. Picketing for unlawful ends may be restrained. N. L. R. B. v. San Francisco Typographical Union No. 21, 465 F.2d 53 (9 Cir., 1972). *See also, e. g.,* Hughes v. Superior Court, 339 U.S. 460, 70 S.Ct. 718, 94 L. Ed. 985 (1950).

could direct its action, if any, toward Whitney and not Shuler. However, consumers could reasonably have believed that Shuler, who sold the homes was his own general contractor. There was no name mentioned. The dispositive factor is the probable effect of the picketing upon the consumer. N. L. R. B. v. Twin City Carpenters District Council (8 Cir. 1970) 422 F.2d 309, 314. Moreover, there was no attempt to explain the controversy so that the public could tailor its response to only the disputed matters. There is a great difference in impact when the public is asked to be selective among products once inside the secondary's premises, *Tree Fruit, supra,* and in asking them to completely refuse to enter, or to cease all dealings with the secondary. *Honolulu, supra,* 401 F.2d at 956–957. Consumers here could reasonably expect that they were being asked not to transact any business whatsoever with Shuler.

■ Even if the Union had tailored its attack directly against Whitney, so that consumers could identify him as the sole subject of dispute, the broad suggestion that his products not be purchased still necessarily encompassed the entire business of Shuler, the neutral secondary. This is an unlawful end under the Act. N. L. R. B. v. Salem Building Trades Council (Cascade Employers Ass'n, Inc.), 163 N.L.R.B. 33, 36 (1967), enforced, 388 F.2d 987, (9 Cir. 1968) (per curiam), cert. denied, 391 U.S. 965, 88 S.Ct. 2034, 20 L.Ed.2d 878.

We have recently held that "where the union chooses to engage in secondary picketing, [it] must accept the burden of properly identifying the struck products." N. L. R. B. v. San Francisco Typographical Union No. 21, 465 F.2d 53 at 56 (9 Cir., 1972). Specificity is required to establish a product rather than a general patronage boycott. *Twin City, supra,* 422 F.2d at 314–315. Here

the Union made no attempt to confine the impact of its conduct.[2]

There is substantial evidence in the record as a whole to support the Board's findings, and thus its order is valid. The Union's actions threatened Shuler and others with an object to coerce them to cease doing business with Whitney. Such activity constitutes an unfair labor practice under the Act. We enforce the Board's order.

### The Contempt Judgment

■ Section 10(*l*) of the Act, *supra,* permits a temporary injunction against union conduct pending the N.L.R.B.'s final determination of such a controversy, when there is "reasonable cause" to believe that the union is engaged in an unfair labor practice, and even though the specific questions involved may be of first impression. *E. g.,* San Francisco Typographical Union No. 21, *supra,* 465 F.2d at 56; Kennedy for and on Behalf of N. L. R. B. v. Los Angeles Typographical Union (9 Cir. 1969) 418 F.2d 6, 8.

■ It is undisputed that the Union's activity at Oak Hills continued after the July 29, 1970, temporary injunction. We have held above that such subsequent activity constituted picketing within the proscription of the Act. It was in substance and effect no different from the pre-injunction picketing. The District Court, in its findings and adjudication in civil contempt found that the Union's post-injunction conduct violated the injunction because it threatened or coerced Shuler and others with an object to cause them to cease doing business with Whitney. The evidence supports that finding. Under *Tree Fruit, supra,* the Union should have been aware of the limitations on its picketing rights. San Francisco Typographical Union No. 21, *supra,* 465 F.2d at 57. Good faith is no defense. *Id.* p. 57.

2. It is immaterial whether Shuler had other homes and apartments for sale at other locations. Consumers who acted on the Union's suggestion to boycott the Oak Hills site might have no interest in other locations. Of course, each parcel of real property is unique, and each subdivision serves a unique public interest because of its location and other intangible factors.

We cannot say that the factual allegations and legal propositions asserted by the Board were "insubstantial and frivolous" when it sought the temporary injunction. Kennedy for and on Behalf of N. L. R. B. v. Los Angeles Typographical Union, *supra*, 418 F.2d at 8; San Francisco-Oakland Newspaper Guild v. Kennedy for and on Behalf of N. L. R. B. (9 Cir. 1969) 412 F.2d 541, 544. Nor can we say on review that the findings and adjudication in civil contempt were clearly erroneous. *See, e. g.,* Donald F. Duncan, Inc. v. Royal Tops Mfg. Co. (7 Cir. 1965) 343 F.2d 669, 670; N. L. R. B. v. Alamo Express, Inc. (5 Cir. 1968) 395 F.2d 481, 482.

The order of the District Court in No. 71–1439 is affirmed, and the N.L.R.B.'s petition for enforcement in No. 71–2828 is granted.